IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Salvatore Pileggi and Susan      :
Pileggi, h/w,      :
         Appellants      :
     :   No. 1279 C.D. 2019
       v.      :
     :   Argued: November 12, 2020
Newton Township      :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE J. ANDREW CROMPTON, Judge **(P.)**


OPINION BY
JUDGE McCULLOUGH                           FILED: January 5, 2021


Salvatore Pileggi and Susan Pileggi, husband and wife (collectively, Appellants), appeal from the August 23, 2019 order of the Court of Common Pleas of Lackawanna County (trial court) granting the preliminary objections of Newton Township (Township) and dismissing Appellants' inverse condemnation action, alleging a *de facto* taking of their land by the Township under section 502(c) of the Eminent Domain Code (Code),[1] 26 Pa.C.S. §502(c).

In this case, the Township allegedly elected not to have a municipal sewage treatment or central collection system to service its residents (at least not in Appellants' vicinity and neighborhood) and has, instead, opted to allow sewage to be disposed through approved on-lot disposal systems. Through various avenues, Appellants attempted to apply for and obtain the necessary regulatory permission

---

[1] 26 Pa.C.S. §§101-1106.

from the Township and/or the Department of Environmental Protection (DEP) to build their proposed sewage facility, but they have been unsuccessful in their endeavors. Dissatisfied with the results, Appellants filed a petition claiming, in essence, that the Township had effectuated a *de facto* taking in denying and/or not ensuring the approval of their proposals for an alternative sewage treatment facility. For the reasons that follow, we affirm.

**Legal, Factual, and Procedural Background**

The Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. 1535, No. 537, *as amended,* 35 P.S. §§750.1-750.20a (Act 537), "requires that all Commonwealth municipalities develop and implement comprehensive official plans that provide for the resolution of existing sewage disposal problems, provide for the future sewage disposal needs of new land development[,] and provide for the future sewage disposal needs of the municipality." *In re Drumore Crossings, L.P.*, 984 A.2d 589, 593 n.5 (Pa. Cmwlth. 2009).

Pursuant to Act 537, each municipality in the Commonwealth must develop and submit to the DEP an officially adopted plan for sewage services for the areas within its jurisdiction and, from time to time, submit revisions to such plans to the DEP as may be required. The official plan of a municipality is a comprehensive scheme, adopted by the municipality and submitted to and approved by the DEP, setting forth the sewage disposal system within its territory. The official plan is often referred to as a base plan and is subject to revision, and a municipality can change its official plan to provide for and accommodate additional, newly identified, and/or existing sewage facility needs of its residents. *See generally* Chapter 71 of the DEP's regulations, 25 Pa. Code §§71.1-71.81.

The regulations of the DEP state that a landowner may file an application for revision of a municipality's Act 537 plan, typically by proposing planning modules. The municipality may adopt or refuse the proposed revision. If adopted, the revision is incorporated into the official plan and is submitted to the DEP for its review and approval or disapproval. *See generally* 25 Pa. Code §§71.51-71.59. Act 537 also provides that a landowner may make a private request to the DEP to issue an order that directs a change to a municipality's official plan. In order for a private request to be approved by the DEP, the landowner must show that the municipality is not implementing its plan or that the existing plan is inadequate to meet the landowner's sewage disposal needs. *See* section 5(b) of Act 537, 35 P.S. §750.5b. Finally, as pertinent here, a landowner can submit to the municipality an application for a permit to construct an individual or community on-lot sewage disposal system. In the event a municipality approves such a permit, the DEP has the authority to revoke the permit if it determines that the permit violates applicable regulations or statutes; if the municipality denies the permit application, the landowner can appeal to the DEP. *See generally* Chapter 72 of the DEP's regulations, 25 Pa. Code §§72.1-72.81. Otherwise, when a landowner desires to use a "[s]ubsurface disposal" system "or other method of disposal of a substance defined as industrial waste under the Clean Streams Law,"[2] rather than an individual or community on-lot sewage system, the landowner must apply for and obtain a permit from the DEP. 25 Pa. Code §72.25(g)(2).

---

[2] Act of July 31, 1970, P.L. 653, *as amended*, 35 P.S. §§691.1-691.1001.

Considered within this legal backdrop, the pertinent facts and procedural history of this case are as follows.[3] Appellants are the record owners of approximately 60 acres of land located at 9156 Valley View Drive in the Township. Six of those acres include a recorded 10-lot, single-family residential development known as "Wooded Lane," which is zoned residential (R-1), with the only permitted use being single-family dwellings. The remainder of the land, comprised of approximately 54 acres, consists of 5 acres that are zoned for single-family or multi-family dwellings, while the other 49 acres are zoned R-1. (Trial court op. at 2.)

In 1973, the Township adopted an official sewage facilities plan and this plan was approved by the Department of Environmental Resources (DER)—now the DEP—on June 19, 1973. On January 6, 1992, the Township adopted a plan update, which was approved by the DER on May 29, 1992. *Id.* at 2-3. In the official plan, as updated, the Township attached an adopted ordinance (Ordinance). In pertinent part, the Ordinance stated that "[a]ll persons installing an individual or community sewage

---

[3] The trial court ably provided a condensed and accurate representation of the gist and factual predicate that gave rise to Appellants' instant action:

> [Appellants], whose land is situated in a township which has an official sewage facilities plan update establishing a preferred disposal method of on-lot, soil-based sewage disposal systems, have submitted numerous applications to the Township and the [DEP] seeking approval to use a package treatment plant with stream discharge rather than the preferred on-lot system. [Appellants'] submissions have been rejected as incomplete and deficient for not being supported by sufficient soil testing demonstrating that on-lot sewage disposal systems are inadequate to meet their land's sewage disposal needs, and in those instances where [Appellants] have appealed the [DEP's] determinations, those regulatory decisions have been affirmed by the state administrative tribunal.

(Trial court op. at 1.)

4

disposal system shall first obtain a permit which certifies that the site, plan, and specifications of such systems are in compliance with [Act 537] as well as all other rules and regulations adopted pursuant to [Act 537] and the provisions of this Ordinance and all other applicable ordinances and regulations of the Township." (Reproduced Record (R.R.) at 349.)

In 1993, the Township amended its Ordinance to include a "Comprehensive Plan Update." In relevant part, an addition to the Ordinance provided that the Township would "[d]iscourage the use of non-soil based sewage disposal methods to limit development to the carrying capacity of the land." (Trial court op. at 4; internal citation omitted).

In 2001, Appellants submitted an application to the Township for on-lot sewage system permits for development in the Wooded Lane area. However, Appellants later decided to abandon this application, stating that they "would take a different course of action." *Id.* at 5 (internal citation omitted).

In 2003, Appellants submitted a planning module to the Township, proposing to construct "a package treatment plant with stream discharge for Wooded Lane." *Id.* (internal citation omitted). However, the Township rejected the application as incomplete because "it did not address the sewage needs of the entire property." *Id.* (internal citation omitted). In 2007, Appellants submitted another planning module to the Township, but, again, this submission was rejected as "incomplete." *Id.* (internal citation omitted). Appellants did not appeal the Township's rejections of their 2003 and 2007 planning modules to the DEP.

In 2008, Appellants submitted a third planning module to the Township, which again "proposed a package treatment plan with stream discharge." *Id.* (internal citation omitted). After the Township allegedly failed to respond in a timely fashion,

Appellants essentially filed an appeal and submitted the planning module to the DEP, which rejected it "as incomplete." *Id.* (internal citation omitted). Thereafter, Appellants appealed to the Environmental Hearing Board (EHB), and the EHB denied the appeal in 2011. Appellants, however, did not file a petition for review in this Court.

On August 6, 2011, Appellants submitted a "private request" to the DEP, requesting an order directing the Township to revise its Act 537 official sewage facilities plan, asserting, among other things, that the Township's plan was "inadequate to meet the residents' or property owners' sewage disposal needs." *Id.* at 6 (internal citation omitted). The Township opposed the request, contending that Appellants failed to demonstrate "that currently available on-lot sewage disposal systems—the permitted means for sewage disposal by the Township's [o]fficial [p]lan with respect to the property at issue—cannot meet [their] sewage disposal needs." *Id.* (internal citation omitted). The DEP agreed and noted that Appellants have failed to conduct sufficient soil and on-site testing to establish that the Township's official plan was inadequate.

After conducting additional soil testing on their property, and discussing the matter with representatives from the DEP, Appellants submitted more planning modules to the Township in 2013 and 2016. These submissions were rejected by the Township, and no further action was taken by Appellants.

Then, in 2017, Appellants submitted another private request to the DEP. In doing so, Appellants sought a directive from the DEP ordering the Township to revise its official plan to allow their property "to be served by a 'Project System,' *i.e.*, [a] non-soil-based sewage system." *Id.* at 8 (internal citation omitted). The DEP denied the request, Appellants appealed to the EHB, and the EHB affirmed the DEP.

6

Subsequently, Appellants filed a petition for review with this Court; however, during the pendency of the instant action, they voluntarily discontinued their appeal on September 11, 2018.

Meanwhile, also in 2017, Appellants submitted yet another planning module to the Township, along with a request for a revision of the official plan. For support, Appellants relied on test results that were obtained in 2001. The Township rejected both the module and request for a revision. In turn, Appellants filed a mandamus action with the trial court, seeking an order compelling the Township to forward their planning module to the DEP and declaring that the requested revision was deemed approved. On August 23, 2018, the trial court granted the Township's preliminary objections in the nature of a demurrer and dismissed the mandamus action. Rather than file an appeal to this Court, Appellants commenced the present inverse condemnation action on August 29, 2019.

In their petition asserting a claim for a *de facto* taking, Appellants averred that the Township's conduct, discussed above, constituted "arbitrary reasons for blocking the permitting process and blatant[] refus[al] to complete [the] modules with the intent to block lawful land use." *Id.* at 11 (internal citation omitted). Appellants contended that the Wooded Lane segment of their property "had been condemned" and that the remaining portions of the property have "been diminished . . . so as to cause a condemnation by taking thereof" and, thus, they requested "the appointment of a Board of Viewers to determine their damages." *Id.* at 11 (internal citation omitted).

In response, the Township filed preliminary objections, seeking to dismiss Appellants' inverse condemnation action for three reasons.

7

First, the Township argued that Appellants "cannot establish a *de facto* taking since the Township has never exercised its power of eminent domain with respect to [Appellants'] land, and to the contrary, has simply utilized its sewage regulatory discretion pursuant to its police powers." *Id.* at 12. The Township further asserted that Appellants failed to allege a sufficient factual basis to support a finding that a *de facto* taking had occurred because Appellants "are free to use their property through the use of a community on-lot or an individual on-lot sewage system" and "may also be able to use their property with an alternative (and presumably preferred) sewage disposal method[, *i.e*, a package treatment plan with stream discharge,] if they take the steps required to submit the soil testing and any other necessary supporting information required to establish that the Township's [o]fficial [p]lan is inadequate to meet their sewage disposal needs." *Id.* (internal citation omitted).

Second, the Township maintained that principles of collateral estoppel and the decisions of the EHB and the Township, to the extent they were not appealed or appealed unsuccessfully, essentially barred Appellants' inverse condemnation action.

Third, the Township posited that Appellants' action was barred by the statute of limitations.

In a responsive filing, Appellants asserted that the averments in their petition raised factual issues as to whether the Township exercised its eminent domain power in regulating and addressing their sewage needs and issues; the administrative actions by the DEP and the EHB cannot be afforded collateral estoppel effect; and their claim has been tolled by the discovery rule and, therefore, the statute of limitations was an inapplicable defense.

On August 23, 2019, the trial court granted the Township's preliminary objections. In its opinion, the trial court provided a cogent discussion of the relevant legal principles, particularly observing that this Court has held that "[i]t is well-settled that the exercise of the police power is not a taking." (Trial court op. at 18 quoting *Lester v. Department of Environmental Protection*, 153 A.3d 445, 466 (Pa. Cmwlth. 2017)). The trial court then offered the following rationale to support its dismissal of Appellants' inverse condemnation action:

> [Appellants'] pleadings and exhibits reflect that they have submitted [p]lanning [m]odules and requested revisions of the [o]fficial [p]lan to the Township in an effort to secure approval to utilize *a package treatment plan with stream discharge* instead of the Township's *preferred sewage disposal method of on-lot, soil-based disposal systems*. [Appellants'] serial submissions from 2003 to 2017 have been rejected as incomplete and deficient by the Township and [the] DEP since they were not supported by sufficient soil testing to properly demonstrate that on-lot, soil-based sewage systems are inadequate to address their land's sewage disposal needs. On those occasions that those determinations have been appealed by [Appellants], the regulatory decisions have been affirmed by the [EHB].
>
> A threshold determination must be made as to whether the Township's regulatory actions under Act 537 and the Township[']s official and revised plans involved the exercise of its eminent domain authority or police power. If the Township's actions concerned the regulation of property to promote the health, safety, and general welfare of the public, [it] embraced its police power rather than its power to condemn. Section 3 of Act 537 expressly states that its policy is "[t]o protect the public health, safety and welfare of its citizens through the development and implementation of plans for the sanitary disposal of sewage waste." 35 P.S. §750.3(1). Per our appellate precedent, "[t]here can be no doubt that the adequate disposal of sewage affects the health and welfare of the public and is therefore subject to regulation by the government pursuant to the police power."

*McNaughton Co. v. Witmer*, 613 A.2d 104, 108 (Pa. Cmwlth. 1992) [(internal citation omitted)].

Even if the factual averments, as opposed to the arguments or legal conclusions, set forth in [Appellants'] pleadings and exhibits are accepted as true, they reflect that the Township's regulatory actions relative to [their] sewage disposal systems requests involved the exercise of its police power relating to the health, safety, and general welfare of the public. It is clear and free from doubt that the Township did not exercise its power of eminent domain so as to effect a *de facto* taking. Consequently, [Appellants] are unable to establish a *de facto* taking by the Township in the exercise of its right of eminent domain. As a result, the Township's preliminary objections in the nature of demurrer will be sustained . . . and [Appellants'] requests for the declaration of an inverse condemnation and the appointment of a Board of Viewers will be dismissed.

(Trial court op. at 19-20; footnotes and some internal citations omitted, emphasis added).

In a footnote, the trial court stated that, while the issue was not expressly raised by Appellants, "it bears noting that when a governmental body's regulatory restriction pursuant to its police power 'goes too far,' it may be recognized as a taking." *Id.* at 20 n.8 (internal citation omitted). However, the trial court concluded that the averments in Appellants' petition "d[id] not raise an issue of fact as to whether the Township's exercise of its police power constituted a constitutionally impermissible taking." *Id.*

Thereafter, Appellants filed a notice of appeal in this Court.[4]

---

[4] "Preliminary objections are the exclusive method under the [] Code of raising legal and factual objections to a petition for appointment of viewers which alleges a *de facto* taking." *German v. City of Philadelphia*, 683 A.2d 323, 325 n.5 (Pa. Cmwlth. 1996). When a court of common pleas sustains preliminary objections and dismisses a petition, our scope of review is limited to determining whether the trial court committed an error of law and whether findings are supported by competent evidence. *Id.* at 326.

10

**Discussion**

Appellants first contend that the trial court erred in concluding that the Township did not exercise the power of eminent domain and that the Township's actions, instead, were done pursuant to its police power. In short, Appellants assert that the Township engaged in the taking of their property and the taking must be construed as the byproduct of the authority to condemn property.

As noted by the trial court, the case law in Pennsylvania has long held that "the exercise of the police power is not a taking." *Lester*, 153 A.3d at 466 (quoting *Estate of Blose*, 889 A.2d 653, 659 (Pa. Cmwlth. 2005)). Indeed,

> the mere fact that a taking has occurred does not necessarily give rise to a cause of action under the Code because acts not done in the exercise of the right of eminent domain cannot serve as the basis of a proceeding in eminent domain. Thus, when determining whether a compensable taking under the Code has occurred, the dispositive question becomes whether the act complained of was, in fact, an exercise of eminent domain power.

*Hill v. City of Bethlehem*, 909 A.2d 439, 444-45 (Pa. Cmwlth. 2006). *See Commonwealth v. Barnes & Tucker Co.*, 371 A.2d 461, 464 (Pa. 1977) ("[G]iven our determination that the Commonwealth is validly employing its police power in a reasonable manner . . . there can be no finding of an unconstitutional 'taking' . . . despite the impact this exercise of the police power may have on the appellant.").

In differentiating between the two, this Court has said:

> Eminent domain is the power to take property for public use and compensation must be paid for property that is taken, injured or destroyed. Police power, on the other hand, is the inherent power of the government to enact and enforce laws for the promotion of health, safety, and general welfare. The difference lies in the nature of the action at issue. Did the government enact or enforce a law or rule, or otherwise "control" the use of property for the health, safety or

11

welfare of the public?  Or did it take property for the public's benefit?

*Ristvey v. Department of Transportation*, 52 A.3d 425, 429 (Pa. Cmwlth. 2012) (internal citations omitted).

Recently, in *Somera Road-835 West Hamilton Street, LLC v. City of Allentown* (Pa. Cmwlth., No. 568 C.D. 2019, filed August 25, 2020) (*Somera Road*) (unreported),[5] a panel of this Court explained the contours of the exercise of eminent domain power as follows:

> Section 502(c) of the Code vests a landowner with a right to assert what is commonly known as a *de facto* claim or taking. By its very nature, this type of claim involves specified property that has not been formally taken by a governmental entity through the actual exercise of the power of eminent domain, and it "is applicable only where a condemnor is found by the court to have taken property without the filing of a declaration of taking." *Department of Transportation v. Schodde*, 512 A.2d 101, 102 n.1 (Pa. Cmwlth. 1986).
>
> Generally, the factual and legal matrix for a *de facto* claim takes one of two forms.  Where, as here, a governmental entity does not announce a plan or its intention to institute formal condemnation proceedings to take a specified portion of land or area, *see, e.g., Lehigh-Northampton Airport Authority v. WBF Associates, LP*, 728 A.2d 981, 985-89 (Pa. Cmwlth. 1999) (discussing cases), a landowner can assert a *de facto* claim by establishing that the consequential or collateral effects from a formal condemnation proceeding have resulted in a taking of his or her property. *See, e.g., Wolf v. Department of Highways*, 220 A.2d 868, 871 (Pa. 1966).

---

[5] We cite *Somera Road,* an unreported decision, for its persuasive value in accordance with section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

12

In this context, a landowner . . . must demonstrate, at a minimum, three separate criteria. "[O]ne of the requisites of a *de facto* taking is that the condemnor must be an entity clothed with the power of eminent domain." *In re Condemnation by Commonwealth of Pennsylvania, Department of Environmental Resources*, 497 A.2d 284, 286 (Pa. Cmwlth. 1985). The second is that the "*de facto* taking **must result from a governmental body's actual exercise of the power of eminent domain**." *Darlington v. County of Chester*, 607 A.2d 315, 320 (Pa. Cmwlth. 1992). And the third is that "the damages sustained by the condemnee[—i.e., the landowner—]must be an immediate, necessary[,] and unavoidable consequence of such exercise." *Riedel v. County of Allegheny*, 633 A.2d 1325, 1328 (Pa. Cmwlth. 1993). In other words, in its condensed formulation, "a *de facto* taking requires that the injury complained of [be] a direct result of intentional action by an entity incidental to its exercise of its eminent domain power." *In re Mountaintop Area Joint Sanitary Authority*, 166 A.3d 553, 562 (Pa. Cmwlth. 2017).

*Somera Road*, slip op. at 13-15 (footnotes omitted; emphasis added).

Here, as the trial court found, during the course of its conduct and actions with respect to implementing its Act 537 official plan and Ordinance and processing Appellants' submissions, the Township did not wield the power of eminent domain in any way. In fact, there is no allegation in the petition that the Township filed a declaration of taking for any part of land within the Township; consequently, Appellants have not averred that a *de jure* taking has occurred. Further, absent the actual and formal exercise of the power to condemn, any adverse effect to Appellants' land and/or property rights cannot be said to have been incidental or otherwise related to an exercise of eminent domain authority; thus, Appellants have not stated a valid claim for a *de facto* taking. *Cf. In re Mountaintop Area Joint Sanitary Authority*, 166 A.3d at 562 (determining that a landowner did not state a claim for a *de facto* taking where "the losses suffered by the [landowner] were

13

merely the unintended consequence" of the governmental authority's condemnation activities and were "not . . . related to or incidental to [the authority's] condemnation powers"). Otherwise, we agree with the trial court that the Township was exercising its police power by enacting and enforcing laws for the promotion of health, safety, and general welfare. Specifically, per the authority of Act 537, the Township developed an official sewage facilities plan, which was updated and approved by the DER, and enforced the plain terms of that plan and its Ordinance when denying Appellants' various submissions for an alternative treatment facility that was not permitted under the official plan or the Ordinance.

Nonetheless, Appellants point to their allegation that, in 2007, a member of the Township's Planning Commission stated "that if [Appellants] put in the sewage system all lots would become buildable and we don't want that." (R.R. at 112a.) Relying on this averment, Appellants cite *Redevelopment Authority of Oil City v. Woodring*, 445 A.2d 724 (Pa. 1982), and assert that the Township was not utilizing its police power because it was taking into account "aesthetic considerations." (Br. for Appellants at 25.)

In *Redevelopment Authority of Oil City*, the city council approved an urban redevelopment proposal that required, among other things, that "[e]xisting above ground utilities shall be incorporated into the underground system" along a specified street in the city. *Id.* at 726. Notably, the introduction to the proposal stated that the city had experienced deterioration due to a "general lack of aesthetics," and that the potential for improvement could be realized through "the provision of public improvements necessary to create an esthetically appealing environment"; the proposal's project description stated that one of the objectives of the plan was to improve economic vitality "by creating an attractive environment"; and the

14

proposal's design objectives "were developed to promote a functional, attractive and visually appealing environment." *Id.* at 727. Based on this fact, as well as other evidence demonstrating that, prior to the adoption of the proposal, the primary concern of the proposal was aesthetic in nature, our Supreme Court concluded that the city was not exercising its police power because "aesthetic reasons . . . could . . . never constitute an exercise of the police power." *Id.* (internal citation omitted). Accordingly, the Court concluded that the city was exercising its eminent domain authority pursuant to an urban redevelopment plan and, in the process, a *de facto* taking had occurred.

The decision in *Redevelopment Authority of Oil City* is readily distinguishable on its facts. Unlike in that case, here, there is no evidence that when the Township enacted its official plan in 1992, or its Ordinance in 1993, the impetus or driving force for the regulations was a concern for the visual appearance of the Township's sewer infrastructure or surface area in general. Rather, on their face, the official plan and Ordinance outlined the needs of the Township regarding sewage facilities, detailed the steps to obtain a permit to construct an on-lot sewage system, and explained which sewage facilities were acceptable. As such, *Redevelopment Authority of Oil City* offers no credence to Appellants' argument and we reject it as meritless.

In the alternative, Appellants assert that even if the Township exercised its police power, the Township acted unreasonably, had gone "too far," and, thus, effectuated a taking. Specifically, Appellants contend that the Township "has taken [their] property by denying permits both for on-lot sewage systems and for alternate sewer systems." (Br. for Appellants at 27.) In essence, Appellants have stylized or

15

re-casted their claim as a "regulatory taking." *See id.* at 26 (citing and discussing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)).

However, in legal terrain governing a regulatory taking, "neither the imposition of [a] permit requirement itself nor the denial of a permit necessarily constitutes a taking." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985). "[A]fter all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired." *Id.* Moreover, Act 537 does not vest Appellants with a statutory entitlement to have a sewer system of their choice. Nor does the common law of property bestow upon Appellants a property interest in having a sewer connection. "It is, of course, old law that a municipality is under no obligation to furnish sewers to particular property owners. Municipal corporations have ample authority to provide sewers but it is not their duty to make every sewer or drain which may be desired by individuals." *Charles v Diamond*, 360 N.E.2d 1295, 1299 (N.Y. 1977). Indeed, "it is virtually beyond question that an individual property owner has no right to insist that the municipality provide him with a [particular] system." *Id.*

Generally, courts "are reluctant to push the notion that the denial of a permit in which one has no property interest can somehow amount to an unconstitutional taking." *Henry v. Jefferson County Commissioners*, 637 F.3d 269, 276 (4th Cir. 2011). To be sure, the United States Supreme Court has said that where a regulation does not deprive a person of a property interest protected by the Due Process Clause,[6] "it would be surprising indeed to discover" that the regulation would

---

[6] *See* U.S. Const. amend. XIV, §1.

16

"nonetheless violate the Takings Clause.[7]" *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 641 (1993). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State College v. Roth*, 408 U.S. 564, 577 (1972). Put simply, "an interest in obtaining sewer service is nothing but an inchoate interest in the conferral of a benefit to enhance market value and . . . [t]he Takings Clause simply does not create an affirmative obligation for local governments . . . to increase property owners' land value." *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 695-96 (4th Cir. 2018) (internal citations and quotation marks omitted). *See Alachua Land Investors, LLC v. City of Gainesville*, 107 So.3d 1154, 1159 (Fla., 1st Dist., Ct. App. 2013) ("[T] he mere fact that the denial of a permit deprives a property owner of a particular use the owner deems most profitable or preferable does not demonstrate a taking."). In any event, for purposes of analyzing the viability of an alleged regulatory taking, it cannot be said that Appellants, at this stage, have lost economically viable use of their land. Even if it is accepted, for the sake of the argument, that they will not obtain a package treatment plan with stream discharge, it is possible that Appellants can still use a community on-lot or an individual on-lot sewage system, if they decided to pursue such a course of action. *Cf. Concrete Pipe*, 508 U.S. at 645 ("[O]ur cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking; *see, e.g.*, *Village*

---

[7] *See* U.S. Const. amend. V. The Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment to the United States Constitution, prohibits the taking of private property for "public use" without just compensation.

*of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution).”); *MHC Financing Limited Partnership v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (holding that an 81% diminution in value was not sufficient to constitute a regulatory taking). Therefore, we conclude that Appellants have failed to allege a viable *de facto* claim as a matter of law.

Appellants' remaining arguments are unavailing and, given their nature, will be disposed of briefly.

According to Appellants, the trial court erred as a matter of law in making a "threshold determination" as to whether the Township's regulatory actions involved the exercise of its eminent domain or its police power. Appellants posit that "[t]he only 'threshold determination' a court is authorized—or permitted—to make is to determine '[i]f an issue of fact is raised' by the petition." (Br. for Appellants at 21.) To the contrary, if the alleged facts, taken as true, are insufficient to state a *prima facie* case for a *de facto* taking, "the preliminary objections must be sustained and the petition dismissed." *York Road Realty Co. v. Cheltenham Township*, 136 A.3d 1047, 1052 (Pa. Cmwlth. 2016). That is the case here.

In their brief, Appellants also challenge how the Township and/or the DEP mishandled their submissions. For example, Appellants assert that at "[t]he heart of this case is [their] averments that the Township unfairly used the pretext, or excuse, of inadequate soil testing to deny [Appellants'] applications for non-onlot sewage treatment for the [p]roperty, and refused to complete [their] module and submit it to [the] DEP." (Br. for Appellants at 30.) In addition, Appellants "aver that the soil testing (done in part by the Township) showed that their soil was unsuitable for on-lot sewage treatment" and "that soil testing is not required for a

property owner to obtain a sewage permit when the owner proposes to use stream discharge, *i.e.*, not on-lot sewage treatment." *Id.* at 30-31. In the same vein, Appellants continue, "the Township improperly used its 1993 'Comprehensive Plan Update'— which is inconsistent with and not part of its 1991 official Act 537 Plan— to thwart development such as theirs. The 'Comprehensive Plan Update' . . . effectively prevents development of any part of the Township that is unsuitable for even alternate-type on-lot sewage systems and contradicts the Township's Act 537 Plan." *Id.* at 31.

However, these and many other allegations made throughout Appellants' brief, including assertions that the Township's and the DEP actions were "unreasonable, arbitrary, or discriminatory," *id.* at 36, merely mount a collateral attack to the way in which the Township and the DEP handled or disposed of their submissions. *See id.* at 38-41. Any errors in these regards should have been pursued through the appeal process and, in the instances where Appellants did file an appeal, the ZHB affirmed the rulings below. In sum, Appellants cannot use the inverse condemnation action and the present appeal as a forum to contest the validity of the administrative decisions denying their submissions. *See Department of Environmental Protection v. Peters Township Sanitary Authority*, 767 A.2d 601, 603 (Pa. Cmwlth. 2001) ("The doctrine of administrative finality precludes a collateral attack of an administrative action where the party aggrieved by that action foregoes his statutory appeal remedy."); *see also Potratz v. Department of Environmental Protection*, 897 A.2d 16, 19-20 (Pa. Cmwlth. 2006) (discussing the applicability of the doctrine of administrative finality in cases involving the permitting process). Further, to the extent that Appellants place fault of the DEP and/or the ZHB, those

19

administrative entities were not named as party-defendants in this suit. As such, we find that Appellants' assertions lack merit.

Therefore, having concluded that Appellants have failed to advance a meritorious argument establishing that the trial court committed an error of law or abused its discretion, we affirm the trial court's order granting the Township's preliminary objections and dismissing Appellants' petition and *de facto* taking claim.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Salvatore Pileggi and Susan : 
Pileggi, h/w, : 
          Appellants : 
:   No. 1279 C.D. 2019
         v. : 
: 
Newton Township : 

## *ORDER*

AND NOW, this 5th day of January, 2021, the August 23, 2019 order of the Court of Common Pleas of Lackawanna County is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge